The next matter is Briggs v. State Farm Fire & Casualty May it please the Court. I'm K.C. Hightower. I practice law in Gulfport, Mississippi. And I'm honored to be with you all today, along with my clients Eddie and Becky Briggs, my law partner Jonathan Dow, and it's certainly an honor to be with counsel opposite John Vanahan. We're here today because State Farm failed the Briggses. They failed to properly adjust their claim. They put them through four years of litigation that resulted in a jury verdict in their favor. On top of State Farm's failures, or as a result of State Farm's failures, the Briggses sought redress in the Southern District of Mississippi, and that matter was carried to trial. The trial court committed errors, though, that prevented the Briggses from being heard completely, being fully heard on all of the issues, and ultimately being made whole. The origins of the trial court's error are rooted in a motion to bifurcate the proceedings filed by State Farm, of course, prior to trial. You didn't object to that, did you? I'm sorry, Your Honor? You didn't object to the way the case was bifurcated for trial. Yes, we did, Your Honor. We responded. It was in the, procedurally, it was in the form of a motion in limine. State Farm moved to bifurcate the trial in the manner in which it was bifurcated, and we objected and said that all of the substantive claims should be heard in Phase 1. I thought the contract claims were in Phase 1. You agreed to that. We agreed. We took the position that not only the contract claims, but the negligence claims, including all damages flowing from those claims, should have been heard in Phase 1. So you presented that to the district court in a motion in limine? In a response to their motion in limine. Procedurally, that's how the issue got to the district court. They suggested a bifurcation. Your request. Right. And we responded to that motion in limine addressing the bifurcation issue. We took a, the Briggs' took the position that under the Veasley case from the Mississippi Supreme Court, which I know this court has had numerous opportunities to review over the years, that in bad faith insurance cases, unlike lots of other, most other contract cases, extra contractual damages of a certain type, not punitive damages, of course, but extra contractual damages of a certain type, attorney's fees, consequential damages, I think perhaps this court has referred to them as, are compensatory in nature. In fact, the language from Veasley says that it's, it uses language like it's foreseeable that a policyholder would incur these types of damage pursuing basically an underpayment. Now, certainly that is within the context of an underpayment, an underpayment as a result of a lack of an arguable basis for denial. When the court bifurcated the proceedings, it essentially allowed only the breach of contract claim to be tried in phase one. There was a gross negligence claim, a negligence claim, and at one point there was a fraud claim. The problem with that was, is that, and with all due respect, I think that the trial court mixed up the substantive claim and the appropriate phase to entertain that claim with the remedy that flows from that claim and the type of damages that flow from that claim. Now, we did take the position in our response that phase one, because of the Veasley case, should be not only the substantive claims, but extra contractual damages flowing from those claims excluding punitive damages, which are clearly a phase two issue. There's a bunch of case law out there that we cited in our brief that supports the notion that perhaps what you're supposed to do is entertain those substantive claims, and I'm pointing to Fowler, Rimmel, Sherman, and Payment, just to name a few. But then, and you would address the contractual damages only. You would hear the substantive claim, but you would be limited in your damages to the policy limits. Then in a phase two, the trial court would conduct this evidentiary hearing, which really has its origins in the punitive damage statute, but have this evidentiary hearing to determine whether or not it is appropriate to submit the question of extra contractual damages to the jury, and then ultimately the court has to make a decision with respect to punitive damages. It's interesting that, and this Court's recognized that the burden of proof on extra contractuals excluding punitives is a preponderance of the evidence standard. Whether or not the insurer had an arguable basis for denial is initially a question of law we maintain, and then, of course, it's a clear and convincing standard with respect to punitive damages. Interestingly, Veasley, I think, at one time had a preponderance to the evidence standard of both. The Mississippi legislature saw fit to amend the statute with respect to punitive damages. But it's important in this case because the Court not only excluded from phase one every substantive claim we had, except for the contract claim, the trial judge then took up the issue of the appropriateness of extra contractual damages. And what I think he did was he took up not only the appropriateness of extra contractual damages, he took up the appropriateness of entertaining the claim in all. And he made a decision after State Farm lodged its motion. He granted them judgment as a matter of law on that issue. Basically extinguished. First he severed our claims, and then he extinguished them. Are you saying he did not allow you to put on any evidence in phase one of your extra contractual substantive claims? Yes, Your Honor. Now. You offered evidence and said we would put this in if you would let us, and you made a. . . Yes, Your Honor. We did that quite a bit. Now, I want to be. . . I thought you agreed that some of that evidence came in. I will say this. The evidence got pretty broad at one point, but the parties were instructed by the court to confine the issues to contractual issues. There was an order that says, and this language appears in several opinions, that it's hard to foresee discussion of whether or not an insurer breached his contract without some discussion of the claims handling that took place. But we were. . . It was abundantly clear to everybody, don't get too far afield. We certainly weren't. . . We certainly were not going to go into anything related to pain and suffering, inconvenience, damages, attorney's fees or anything like that, but to basically discuss enough of it to give the jury a flavor of how the claim was dealt with on State Farm's end. When we were put under that order, not only did we lose the motion in limine and we properly objected, the issue was preserved in the pretrial order. The issues were delineated in the pretrial order, and gross negligence and negligence is in there. State Farm has asserted, interestingly, that there's not a negligence claim pled. That's in direct conflict with the pretrial order. It's also in conflict with the pleadings. You know, to the extent that the pleadings allege gross negligence, I don't know how you commit gross negligence without first committing negligence. But that's beside the point. We weren't allowed to be heard on that. I think it's a fair question to say, so what? Okay, is this an academic discussion about how, you know, the courts of Mississippi should procedurally address these types of claims? It's more than that, because the basis upon which State Farm's motion for judgment as a matter of law rests was, of course, that we had failed to create a jury question. And Rule 50 speaks to that. But the first sentence of Rule 50 says, after being fully heard on all issues. Now, in fairness to the trial court, once we rested under the dynamic or the rubric that was imposed, we were afforded an opportunity to make a proffer of what we would show if we were allowed to go forward on our other claims. I submit to you that that's not being fully heard on the issues. What I can say in even a 30-minute proffer is not as compelling as what would have come out of the witnesses' mouths on direct examination and cross-examination. I want to be clear. Were you allowed to put on evidence that there was no arguable basis for State Farm to? Yes, Your Honor, we were allowed to address that issue, but we were not allowed to put on evidence, in my view, in the breach of contract claim, that there was no arguable basis for denial. We were allowed to demonstrate that they breached the contract, that they underpaid, but we were not. During the trial, did you say, Your Honor, we would like to go further and put on evidence of no arguable basis? And he said, no, we're not trying that? That is essentially correct, Your Honor. In fact, there were several offers of evidence during the trial. One of them was the Mississippi Policyholder Bill of Rights, which was promulgated. All right, we got that one. Okay, you've got that one. All right. The other one was going to be proof that would have related to when they received our expert report, eight months prior to trial, from an expert who they themselves had retained either in the recent past or while the litigation was pending that they didn't follow up on. There would have been additional proof about the experiences that the Briggs' had with the claims handler, which it was interesting to me that we got away from it. It was around 12 or 24 different people? Fifteen, I believe it was, Your Honor. And notably, nobody ever wanted to embrace the term adjuster. We've gotten away from that term. It's claims handler. I think that's probably more accurate because that's about all that happened was we got handled. There was never any adjusting done other than by the Briggs'. There was some computerized. Xactimate. Yes, Your Honor. It's spelled with an X. It's Xactimate, Xactimate. But the idea is a gentleman walks in and takes some measurements. He enters the measurements, and the computer spits out an estimate. The problem with that is that the witnesses at trial, of course it happened in the depositions. They actually testified at trial that they completely deferred to the data used by that program. This house was insured just outside of Scuba, Mississippi. I suspect this court's never had an opportunity to be there. I have. It's a wonderful place. It's remote, and it's about 40, 50 miles north of Meridian, Mississippi. The best that State Farm could ever do was to say, Well, on the Xactimate printout, there's an ME09 designation, and I'm calling that from memory, which tells us that that's based on prices from Meridian, Mississippi. We said, Did you ever verify those prices? No. Their own expert who had our, their own expert in another matter, of course, who had our report from our case told them their information was wrong. Interestingly, they never put on, they had a contractor pre-trial who they had identified, I think, as a May call witness, and he didn't testify. I would submit to you that if their contractor. Did you have him on your list? Sir, ma'am? Did you have him on your list? Could you have called him? I did not have him on my list. You didn't like what he said. He never did an estimate. I thought you said he was a contractor. He was. He was hired to opine, I guess, as to the strength of our case. That's the best I could ever tell. I asked him why he never, I asked him in a deposition why he didn't prepare an estimate. He said that wasn't what he was hired to do. Let me ask you, was there a simple negligence claim? I think that you mean that we pursued? Not gross negligence, but just because they went around and a bunch of people did it or something. The right hand didn't know what the left hand was. Yes, Your Honor, there was. And it would have centered around the fact that it took four years and lots of correspondence and all that, that was the basis of the negligence claim. The fact that they literally testified that the person adjusting the claim could not tell you if the information that his software was using was accurate. The jury heard that? Excuse me, Your Honor? The jury heard that or that was deposition? The jury did hear that. Well, the jury saw the demonstration because I asked him, I took the estimate, and I said, they said, okay, this light bulb, I'm using that as an example, it shows a unit cost of $2.38 based on the exactimate date. I said, what part of that is attributable to the cost of the bulb? I don't know. I said, well, if you don't know that, then you certainly don't know what part of it is attributable to the labor to screw the bulb in. And I'm using that as a loose example, but I went through that. He said, I do not. His position was, State Farm's position was, that's what the computer told us. That's not an adjustment. That's just being handled. That alone, importantly for this case, created at least a question in the mind of a reasonable juror as to whether or not State Farm had an arguable basis for what they did. And when Judge Jordan took that issue away from the jury, he erroneously stepped into the place of the jury, with all due respect. We had certainly put on sufficient evidence such that a reasonable juror could find that they acted without an arguable basis. They gave us an award of $72,000. I'm not suggesting to you that that's dispositive of the issue, although State Farm argues in their brief that if they had gotten a defense verdict, that that would have been conclusively established that they didn't act in bad faith. I don't know why the converse of that is not true. Well, they gave you less than the policy limits, right? They gave us about $20,000 less than policy limits. But they gave us double what State Farm maintained through their opening statement. We were entitled to, their position was that we were entitled to either $0, $36,000, and that would be it. And the jury rendered a $72,000 verdict. My time is up. All right. Let's save some rebuttal time. Mr. Banahan. Thank you, Your Honor. John Banahan on behalf of State Farm. If I could just address a couple of the questions that were raised and some of the comments, and I'll get into the argument. I'll reserve any comments about the Mississippi policyholder bill of rights, unless the court would like to hear something on it. There really wasn't much said about that. But I'll be happy to address that if the court needs anything on that or has questions. The first question or the first issue was that State Farm had put the Briggs through four years of litigation. I'll submit to you that if you look at Mr. Briggs' letter, June 8, 2011, which was Exhibit 7 at trial, this was just a little over a month after the loss and after he got a check for what State Farm believed to be the damage to the property or the damaged part of the property. He indicated that Jeff Hill promptly visited the site on April 29 and 30, that Mr. Hill took at least two days taking pictures and documenting the extent of damage to our home. Now, that's significant because the insurance policy doesn't cover, it's not like a valued policy law claim on a fire loss. If you have a total loss to your house with a fire, your whole house gets paid for. That's the law in Mississippi. Here, the house wasn't a total loss, and you were afforded to have one photograph in the plaintiff's reply brief or the appellant's reply brief that showed extensive damage to the kitchen of this home. I'd invite you to look at the hundred pictures that surround that one exhibit that show rooms that don't appear to have any damage at all. So it's just a little misleading to look at that one photograph. But what Mr. Hill did was try to apply that policy to this loss. What was damaged? What do we need to pay for? And within a week, there was a check in Mr. Briggs' hand. What Mr. Briggs said on June 8 was he asked for a list of licensed contractors that could do the work that were preferred providers that State Farm had. They immediately, almost immediately, Mr. Hill got back to him and said, we don't have any in that area. Mr. Briggs did get his own contractor, Mr. Raley, and he says that on the second page of that exhibit. He said, I employed a licensed contractor from Meridian to evaluate the damage. He made a detailed evaluation, and he said it was not economically feasible to repair the house. Mr. Raley, who testified at trial, did say that he thought the house could be repaired. He didn't agree with what Mr. Morgan said three or four years later. He said, I think the house can be repaired, but I think they didn't go far enough. And if you'll see in our briefs, Mr. Raley, there was difficulties. Mr. Briggs would not allow State Farm to communicate with Mr. Raley, the contractor. Ultimately, they obtained an EUO from Mr. Raley. They got information from Mr. Raley. When they got that transcript back, they made additional payments for the items that they thought were still owed. Judge Jordan went through this in painstaking detail at the trial, during evidentiary hearings and at the trial of the case, and determined that State Farm did what is normal. There was give and take, back and forth. But Mr. Briggs, in this case, indicated in the same letter that he wasn't really wanting to litigate, but he was already threatening litigation within a month and saying he had the largest verdict ever in Kemper County and he thought Kemper County jurors would be fair in resolving this dispute. That's kind of the backdrop of all this, and there was not that typical give and take. It did create problems, but it never was to the point that State Farm shut the claim down and said we're not going to deal with this anymore. When they did get additional information, they made additional payments on it. As to bifurcation, we cited, I think, 11 federal court opinions, two state court opinions in our brief. He's talked about the Fowler decision, which was one of Judge Osreden's cases, and unfortunately I've got the scars to show it. I've tried some of these cases, these Bay of Faith cases. They're always involving a lot of passion and a lot of high emotion, but every case that I've tried and every case I know of that has been tried has been bifurcated in either this fashion as this case was tried or in a very similar fashion. What they miss on the Fowler case, and the Fowler was one of many cases that had been cited, many of them by Judge Sinner because he had the bulk of the Katrina litigation, but they leave out some language in their brief to you. They don't mention that Judge Osreden's opinion went on to say that if there's a plaintiff's verdict in the first phase on the issue of coverage, on the issue of coverage under the plaintiff's policy, the second phase will include the determination of whether there was any arguable reason to deny the claim and whether the plaintiffs are entitled to recover extra contractual damages, whether it's simple negligence, whether it is anxiety, emotional distress, those types of measly damages that they're talking about. Okay. So what you're arguing essentially is there's no evidence of any of these extra contractual claims, basically a summary judgment standard. Right. And we did move for summary judgment, Judge Owen. I mean, it's not summary judgment. It's a question of law. Is there evidence or not? Should it have been submitted to the jury? Right. And was there evidence that a reasonable juror could conclude that there was a lack of an arguable reason? That is exactly the standard that Judge Jordan applied in the case. It was fully briefed because we did file a motion for summary judgment. He carried that forward with the case. He denied it at that time. I renewed our motion at every opportunity. At the conclusion of the case, Judge Jordan, looking at the totality of the claim handling, said — It shouldn't be totality, should it? I mean, it's a question of is there some evidence from which a jury could find that there's no arguable basis? It's not some evidence. It's some credible evidence that a reasonable juror could conclude. Okay. And they say we got passed around the fact that the jury awarded $72,000, the fact that it took so long. They say that's some evidence from which a jury, a reasonable juror, could find that there was no arguable basis not to pay more. Yes, I understand that, and that is the Briggs. Isn't that some evidence? Isn't that some evidence? It is some evidence, but it would be some evidence if Mr. Briggs just stood up and said, I feel grieved by this process. I don't like the way I was treated. That would be some evidence. The question for the Court and the question that was answered by Judge Jordan was, was there credible evidence that State Farm had that created an arguable reason, that gave them an arguable reason for a position that they took on the claim? What Judge Jordan said was he thought it was reasonable, and I still think it was reasonable that State Farm relied on the two men who actually looked at this house before Mr. Briggs decided to have the county tear it down, again, his right, his property. But the only two people who could offer any information on this were Jeff Hill, who was out there within days, and Mr. Raley, who came within a 20-day period, was out there four times. Mr. Raley said you need to tear it down because it's not economically feasible, but you can repair it, and I think it's going to cost this much more to make the repair. That's what State Farm was trying to get to, is what is it you say was not covered that should have been covered? Procedurally, was this a 50-A ruling or a summary judgment ruling? Because the jury never heard any evidence on the second phase, so I'm not sure that a 50-A would apply more than maybe a summary judgment ruling. Judge, procedurally you got me there. I think it was a Rule 50 is the way it was interpreted by Judge Jordan. The standard that he applied was, was there any credible evidence that a reasonable juror could conclude that there was a lack of an arguable reason? Because, you know, and K.C. is right, Mr. Hightower is right, there's two levels of damages you can get beyond the contract. The first one, all of those damages, the Beasley damages of any type, require the lack of a legitimate and arguable reason for a position that the carrier took. The second level is— If that's once all the evidence is presented, then the judge makes a ruling, but in here there was no evidence presented in the second phase because there was no second phase. That's the purpose of the evidentiary hearing, and Mr. Hightower is correct. When the statute was enacted, I think in 1993, since then, there's a gatekeeping hearing that must be conducted on cases in Mississippi for punitive. Judge Jordan did that in his role as to whether or not is this evidence that should go to a jury on the extra-contractual claims as well. That is exactly what Judge Sinner did in the cases that we tried after Katrina. And it's what the other judges, the cases that have been cited herein, Judge Oserden, in that Fowler opinion, contemplated the same thing. You wouldn't present that information to the jury, and I think Judge Sinner was correct in all of his opinions. He said, they've got to hear something. And so a lot of something got tried in the first phase of this trial as far as how the claim was handled. When we got to the evidentiary hearing where Judge Jordan was to make a decision, do we go forward from here, the plaintiffs offered three exhibits. Two were two different versions of the Mississippi Policyholder Bill of Rights. One of them was the one that the department had, their standard. The other one was the one that State Farm had adopted and sent out as they were instructed to do with all other insurance carriers. The other was the claim handling documents. There was nothing in the proffer, nothing made in the proffer when they had in that evidentiary hearings for that purpose. They simply incorporated all of the evidence that had been introduced during phase one and then offered those three additional documents and then provided some argument as to how Mr. and Mrs. Briggs did not like having 15 claims handlers and those sorts of things. But they had every opportunity. My point is there were three documents, essentially two, that were offered that the jury didn't hear in the first phase of the trial. And that's typically how these go. They could have presented testimony. Is that what you're saying? Not just the documents? It's an evidentiary hearing. They can do whatever they want to do. It's a hearing. It's their opportunity to do and say whatever they want to do to ask the court, can we move on to the next phase of this trial? There was evidence that the jury heard and the judge heard that at least one person said it can be repaired but it's not economically feasible to repair it. So it was 50-50. One person said it can be repaired for X. Another person said, well, you can physically repair it, but it makes no sense to do it. It should be torn down. So is that some evidence or not of no arguable basis? There actually were three, Judge Owen. There was an opinion from or testimony from Jeff Hill who performed this estimating process, and that exactment is just a tool rather than handwriting it. They go to take pictures and scope all the damages. Then they take measurements. They determine how much sheetrock, how much paint, how much everything. We talked for three days about one light in the hallway, and no one could say how much of that $56 item, line item, and estimate was for labor and how much was for material. I'll submit to you Mr. Briggs didn't ask that. You see his letters that were written, that was not what he was asking for as far as State Farm's duty to get information. I'm going to put the bigger picture here. The jury heard testimony that at least one person said, yes, you can physically make repairs, but it would not be economically feasible to do that. It's cheaper to tear it down and start over. I ran off down a rabbit trail, and I apologize. I was trying to get to that. There were three experts or three opinions. I talked about Jeff Hill. The second one was Wayne Raley. Mr. Raley is the one who said it's not economically feasible. He was the contractor. Either Mr. Briggs or his attorney retained to go and look at the property. The third was Jody Morgan, who was designated as an expert witness in the case. It's the first time we saw anything about Mr. Morgan was in expert designations. Judge Jordan looked at that, your very question, very carefully and said and concluded that in his opinion as that gatekeeper that reasonable jurors could not conclude that State Farm did not have a reasonable basis to rely on a 50-page detailed estimate with photographs and further rely on information that they obtained from Mr. Raley, the plaintiff's contractor, and accept that over a very global, very large unit pricing approach that Mr. Morgan applied, particularly in light of Mr. Morgan's testimony at trial, which was I didn't look at Mr. Raley's stuff. He does things differently from me. I didn't look. I just scanned the detailed estimate. It's useless to me. That was his testimony at trial. The significance of that is he never saw the house, and the policy doesn't cover if you have a storm, we pay for the whole house. It's what's damaged. The only two people who could offer any evidence on that would have been Mr. Hill, the Briggs, and Mr. Raley, their contractor. That's what State Farm relied on. The Court thought that was reasonable. Could there or was there or can there be a simple negligence claim that would have continued? In other words, there's no bad faith, there's no gross negligence, there's a reasonable basis, but the way it was handled was done so sloppily and changed hands around that maybe there was a simple negligence complaint that could have gone forward? That's what Judge Jordan understood, the negligence complaint. And the reason we say we felt like they let that one pass is that there was a negligence and gross negligence count in the complaint. If you look at the complaint, it talks about gross negligence. So factually, they never developed it in a very well-played complaint, and that's what Judge Jordan commented on there. You can recover for that. Judge Jordan did not preclude them from that. He just understood incorrectly so that that is an extra contractual damage. It would not go in in the first phase of the trial. They wouldn't go to the jury and say, give me something during this first phase because you were negligent in your claim handling, until the judge looked at that during this evidentiary hearing and said, there's enough here, we should go to the jury on this. And they certainly would not have been precluded at that point. That was the whole purpose of the bifurcation. Yes, it is, Judge Clement, it is. And that is what I'm saying. I was a little surprised with that approach to the appeal because that's how we try these cases. And I'm not saying we're doing something off the radar here. That's what all these cases that are cited here in these briefs, both briefs, indicate. That's how you do it in Mississippi. That's how we do it in Mississippi, Judge Clement. And I'm sorry to say I've been here more than once. Sometimes we don't get it right. But I think in this particular case that we did get it right. I think State Farm fairly adjusted the claim. Judge Jordan certainly came to that conclusion after he fulfilled his role as a gatekeeper in this case. I'll be happy to answer any further questions. If you have, I'm not going to sit up here and waste your time just talking, unless the Court has further questions from State Farm's position or perspective on the case. Have any settlement negotiations taken place since the jury verdict and the ruling by Judge Jordan? We tried. Judge Jordan instructed us to go out. He gave us every opportunity. I can tell you that we were grossly unsuccessful to the point that I didn't think and I don't think that Mr. Hightower legitimately believed that we could do it through the mediation process with the Court here. All right. Well, I'll ask him, but it seems like a lot of attorney's fees are being spent. And you've still got policy limit money left. There's still money that the jury elected not to award under this policy. That's not the end-all, be-all. The jury can say whatever they want. The case law indicates that if you don't guess right or you don't calculate correctly, that's not an issue of bad faith. And I don't think it was in this case. All right. We'll see what he says. All right. Mr. Hightower. Thank you, Your Honor. Let me address first the reference that Mr. Banahan made to the cases in Mississippi involving coverage and the suggestion that I think it's important to keep in mind that those truly involved the scope of coverage. I think a lot of those were wind-water cases, and there was never an issue. State Farm had no way to deny that they covered the property at issue in this litigation. We weren't talking about anti-concurrent cause clauses. We weren't talking about wind versus water. It was the breach of contract claim and the negligence claim and the gross negligence for the way that they handled the claim or claimed to have adjusted it. I think that the gatekeeping role is a recognized role for the trial court, and it's an acceptable role, but nothing in that statute nor Rule 50 contemplates making that decision in the absence of having fully heard the proof on all of the issues. And, frankly, I do not think that a proffer, after having been limited by order in limine, and then whether it went off procedurally on a 50A or a summary judgment, and my recollection is it 50A, that you can make that decision without having heard all of the proof. I don't believe that the case was bifurcated correctly, obviously, but I think that the harm in that was that the trial court was not well prepared to make that decision. Was there an opportunity for proffer of whatever evidence you wanted to put on? Yes, there was, Your Honor. Did the trial court cut you off or say, I don't want to hear that? No, the trial court did not. But you had the opportunity to put in whatever you wanted to on those issues? On those issues, we had a proffer opportunity, yes, Your Honor. That's what constituted the evidentiary hearing. So you're going to rise or fall on what that – you have to rise or fall on what that proffer was? I was going to be stuck with that, Your Honor. Okay. Yes, Your Honor. The problem with that, though, is, number one, the evidence that was adduced in our case created, I think, fortunately, created – was constituted sufficient evidence such that a reasonable juror could have found it. That's what we're – yeah. To me, that's the issue. And I think it is. And I think there was a sufficient quantum of doing it. But to me, it's problematic to say you didn't put on enough proof to create a jury question when you gutted my case in the beginning and then extinguished it when I rested on the breach of contract claim. And I understand that I was given a proffer opportunity, but frankly that's not the same as putting a witness on the stand like these witnesses. One thing you asked a while ago, Judge Owen, that I tried to respond to, what else would you all have shown? One thing was the claims handling manual. We would have been able to – we planned to go through there and demonstrate noncompliance with their own manual. That would have been a negligence-type proof. That would have been proof that would have suggested a lack of an arguable reason for denial. Didn't you argue that on the case in chief to say that the amount was not right? We did, but we weren't allowed to enter the manual itself into evidence for the jury's consideration to assess the procedural handling. We were able to do it through witnesses. Don't you do this, don't you do that, but certainly not to go line by line because I believe the trial court's view of that would have been that would be too much. You could have put it in at the proffer. You could have put the manual in and said this witness will say this. And we addressed those type issues as part of the proffer, yes, Your Honor. That's in front of us. We can look at that. It is in front of us, yes, Your Honor. If it creates a fact question, it does. If it doesn't, it doesn't. I'm sorry, what was the last part? If we've got all the evidence, including the manual and your arguments about the manual, that either raises a fact question or it doesn't. I agree with that, Your Honor. I certainly would have liked to have had the benefit of putting on all my case, but yes. I just want to know, is there any evidence that you say shouldn't, that we should consider that's not in the record, that wasn't in front of the judge? Let me say this. I don't think that I could adequately cover the waterfront as a practical matter in a proffer session as comprehensively as I would have been had I been allowed to put on witnesses to prove those claims. But the basic evidence is there. Yes, Your Honor. And I guess my fear is that I'm going to tell you that there's nothing else out there and that I addressed it all in the proffer, and I'm not capable of doing that, and I frankly can't remember everything that I addressed in the proffer. But, yes, the arguments were made, and we made reference to the fact that we believed, in response to the motion for judgment as a matter of law, that the proffer in conjunction with the proof that had been put on created a sufficient fact basis such that extra contractual damages ought to be submitted to the jury for consideration. I thank you. All right. What's your answer to the question I asked Mr. Banahar? Would it be a waste of time to refer you to our conference attorney to try to negotiate a settlement? I don't ever consider any involvement with the court in an attempt to resolve something a waste of time. We're amenable to that. Mr. Banahar is correct. We discussed that issue very early on in response to your question, Judge Clement, and I think it was pretty clear at that point that the parties were not anywhere near resolution at that time. All right. Why don't you check with your clients, and if you think it would be beneficial, we'll refer you to the conference attorney here, you know, totally without our involvement. It would just be you and maybe your clients meeting with him. We'll do that. All right. Sometimes it works. All right.  We've concluded our docket for the week. Thank you.